**United States District Court**
For the Northern District of California

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BOSTON TELECOMMUNICATIONS
GROUP INC., et al.,

    Plaintiffs,

v.

ROBERT WOOD,

    Defendant.

No. C 02-05971 JSW

**ORDER DENYING ROBERT WOOD'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

This matter comes before the Court upon consideration of the Motion for Summary Judgment, filed by Defendant Robert Wood ("Wood"). Having considered the parties' papers, relevant legal authority, and the record in this case, the Court HEREBY DENIES Wood's motion.[1]

## BACKGROUND

The following facts are undisputed, unless otherwise noted. Plaintiff Roderick Marshall ("Marshall") is an attorney, whose practice has focused on general corporate business law. (Declaration of Lidia Stiglich in Support of Motion for Summary Judgment ("Stiglich Supp. Decl."), Ex. A, Deposition of Roderick Marshall ("Marshall Depo.") at 7:2-9:9).)[2] Plaintiff

---

[1] Although Plaintiffs sued a number of individuals and entities and asserted a number of claims, Wood is the only defendant who remains in this case, and the sole claim Plaintiffs assert against him is their fraud claim.

[2] The parties each submit deposition transcripts of the parties and other witnesses with their papers. In order to clearly identify which party has submitted the evidence cited by the Court, the Court cites both to the declaration to which the various

1 Boston Telecommunications Group, Inc. ("BTG") is a company that Marshall formed to
2 participate in the investment that gave rise to this dispute. (*See, e.g.,* Stiglich Supp. Decl., Ex.
3 P.) The Court shall refer to Marshall and BTG collectively as "Plaintiffs."

4 In approximately 1991, Marshall moved to Bratislava, Slovakia, where he worked
5 initially for the law firm Squire, Sanders & Dempsey. (Stiglich Supp. Decl., Ex. A, Marshall
6 Depo. at 11:6-15, 11:22-12:16.) In approximately 1992 or 1993, Marshall met Wood, who was
7 the managing partner of Deloitte & Touche, Slovakia ("Deloitte Slovakia"), and they became
8 close friends. (*Id.*, Marshall Depo. at 24:11-12, 25:11-12; Stiglich Supp. Decl., Ex. B,
9 Deposition of Robert Wood ("Wood Depo.") at 56:1-5, 92:3-16.)

10 Between 1995 and 1998, Wood and Marshall discussed possible investment
11 opportunities. However, with the following exception, Marshall chose not to invest in those
12 businesses. (Stiglich Supp. Decl., Ex. A, Marshall Depo. at 29:3-33:3, 42: 5-8, 46:5-11.) In
13 1995, Global Cable Systems, Inc. ("GCS") retained Deloitte Slovakia in connection with a
14 cable television opportunity in Bulgaria ("the Cable Venture"). (Stiglich Supp. Decl., Ex. B,
15 Wood Depo. at 106:10-14; Stiglich Supp. Decl., Ex. C (Deposition of Christopher Ashby
16 ("Ashby Depo.") at 62:21-23.) The basic structure of the Cable Venture was that GCS created a
17 wholly-owned subsidiary Global Satellite Transmission Systems, Inc. ("GSTS") to acquire
18 cable television licenses from two Bulgarian companies, Globo AD ("Globo") and Union
19 Television, Ltd. ("Union Television"). According to Plaintiffs, they were told that GCS
20 intended to transfer the licenses to a joint venture between GCS and United & Phillips
21 Communications BV ("UPC"), Tevel Israel International Communications Ltd. ("Tevel"), and
22 Bezeq Israel Telecommunications Company, Ltd.[3] (*See, e.g.,* FAC ¶ 32.b; Stiglich Supp. Decl.,
23 Ex. A, Marshall Depo. at 78:22-80:17, 121:1-23; Stiglich Supp. Decl., Ex. D, Deposition of
24 George Mainas ("Mainas Depo.") at 31:10:24.)

26 deposition transcripts are attached as well as the relevant portion of the transcripts.

27 [3] In their First Amended Complaint ("FAC"), Plaintiffs allege that United &
28 Phillips Communications BV was a "joint undertaking consisting of a subsidiary of Phillips Electronics, Philips Media, and United International Holdings." Tevel was a Tel Aviv cable company, and Bezeq was the national telephone company of Israel. (FAC, ¶ 32.b.)

2

At some point, GCS had problems obtaining funding for the Cable Venture, and Marshall offered to and attempted to find other investors. When those efforts did not succeed, he invested $550,000 of his own funds in the Cable Venture. (*See, e.g.,* Stiglich Supp. Decl., Ex. A, Marshall Depo. at 63:8-65:13, 146:12-4-20; Stiglich Supp. Decl., Ex. B, Wood Depo. at 202:8-203:16.) Plaintiffs claim that the "Defendants" made a series of misrepresentations and omissions of material fact in order to induce them to invest in the Cable Venture. (*See, e.g.,* FAC ¶ 117.) According to Plaintiffs, those material misrepresentations and omissions included:

- that GCS was seeking to acquire Globo and Union Television ["the Bulgarian cable companies] in order to contribute those entities and their respective cable licenses with a joint venture that would develop and build out those cable systems;

- that an international consortium consisting of UPC, Tevel and Bezeq was interested in acquiring the Bulgarian cable companies from GCS;

- that a joint venture involving UPC, Tevel and Bezeq was in place and would develop and build out those cable systems such that they would reap substantial profits;

- that the assets of one of the two [Bulgarian] cable companies in the [Cable Venture] Union Television, had a value of approximately $48 million, according to a Deloitte valuation;

- that Deloitte would offer Marshall business referrals and partnership in the firm if he provided the necessary investment in GCS's [Cable Venture];

- that Deloitte would guarantee the value of the [Cable Venture];

- that Marshall and BTG would reap a substantial profit as a result of their investment in the [Cable Venture]; and

- that Marshall and BTG were providing a great service by making an extraordinary investment (for Marshall), which assisted Deloitte and Wood personally when they faced substantial losses if GCS's [Cable Venture] fell apart due to a lack of financing/investment.

(FAC ¶ 117.a-h.)

In their opposition to Wood's motion, however, Plaintiffs appear to retreat from these allegations. Rather, Plaintiffs contend that "Wood failed to inform Marshall of (1) internal Deloitte research that had been conducted with respect to the [Cable Venture]; (2) concerns that both Deloitte and other potential investors had regarding the viability of the [Cable Venture];

3

1  (3) concerns that the Vancouver Stock Exchange had regarding GCS's business plan; (4)
2  difficulties that Deloitte had encountered in putting a value on GCS and the [Cable Venture];
3  and (5) the kickback agreement that Wood had entered into with Mainas and GCS just prior to
4  soliciting Marshall's investment." (Opp. Br. at 2:16-22 (citing Declaration of Thomas Wintner
5  in Opposition to Motion ("Wintner Opp. Decl."), Exs. E-M).)

6  The Cable Venture did not proceed smoothly, and, on July 1, 1997, Marshall wrote a letter to Mainas, in which he expressed concerns about the Cable Venture. (Stiglich Supp. Decl., Ex. O (the "July 1, 1997 Letter"). In that letter, Marshall stated his belief that "my investment in [the Cable Venture] was, in all likelihood, a complicated fraud against me." (*Id.* at BTG-00322.) Marshall did not receive a response to the letter, and he testified that he did not follow up with Mainas, because "the negotiations with Mr. Mainas were very strained. Bob Wood and I together were blaming Mr. Mainas for many difficulties at this time." (Stiglich Supp. Decl., Ex. A, Marshall Depo. at 209:13-24.) Marshall acknowledges that the letter accused Mainas of defrauding him. Marshall also threatened to sue GCS. (Stiglich Supp. Decl., Ex. A, Marshall Depo. at 211:5-13, 215:18-24.) According to Marshall, the July 1, 1997 Letter, which was drafted by Marshall and edited by Wood, "was a calculated effort to get [Mainas] to do what he should do." (Wintner Opp. Decl., Ex. A, Marshall Depo. at 214:3-7.)

18  Plaintiffs did not sue at that time. Marshall testified that Wood convinced him not to sue, in part, because Wood claimed that Mainas had something on Wood. Marshall also testified that he did not sue, because Wood assured Marshall that the Cable Venture would be successful. Marshall believed Wood because of their friendship, and he relied on Wood and "his method for handling this matter." Marshall also testified that he believed Wood, because the licenses were not going to "go anywhere." (Wintner Opp. Decl., Ex. A, Marshall Depo. at 212:2-215:1, 219:11-24; *see also* Stiglich Supp. Decl., Ex. A, Marshall Depo. at 211:5-13, 215:2-217:19.) Thus, notwithstanding the concerns set forth in the July 1, 1997 Letter, Marshall continued to work on the Cable Venture. (Stiglich Supp. Decl., Ex. A, Marshall Depo. at 210:20-211:4, 217:3-8.) However, he also testified that he did not know if there was any progress and testified that he made no effort to obtain reports to which he was entitled as a GCS

4

1 shareholder. (*Id.*, Marshall Depo. at 216:7-217:23, 221:3-20.) Marshall claims that in late
2 2000, Wood finally told him that Deloitte would not guarantee the investment and that his
3 money was lost. (Wintner Opp. Decl., Ex. A, Marshall Depo. at 225:1-24; Stiglich Supp. Decl.,
4 Ex. A, Marshall Depo. at 226:1-7.)

The Court shall address additional facts as necessary in the remainder of this Order.

## ANALYSIS

**A.      Legal Standards Applicable to Motions for Summary Judgment.**

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to, *inter alia*, depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(A). A party may also show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if the fact may affect the outcome of the case. *Id*. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e). The non-moving party must "identify with reasonable

5

particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**B.    There Are Disputed Issues of Material Fact that Preclude Summary Judgment on Wood's Statute of Limitations Defense.**

Wood's first argument in support of his motion for summary judgment is that Plaintiffs' fraud claim, which was asserted against all of the Defendants, is time barred. Under California law, the statute of limitations governing a fraud claim is three years. Cal. Code Civ. Proc. § 338(d). Normally, "'[a] cause of action accrues when the claim is complete with all of its elements.'" *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1039, 1054 (9th Cir. 2008) (quoting *Slovensky v. Friedman*, 142 Cal. App. 4th 1518, 1528 (2006), *as modified*). However, Section 338(d) incorporates the "discovery rule," and provides that a fraud claim "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."

"Discovery, for purposes of [Section 338(d)], is not limited to actual knowledge." *General Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1397 (9th Cir. 1991). Under California law, "inquiry notice is triggered by suspicion." *E-Fab, Inc. v. Accountants Inc., Services*, 153 Cal. App. 4th 1308, 1319 (2007). "'Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights.'" *Id.* (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988)); *cf. General Bedding*, 947 F.2d at 1379 ("constructive and presumptive notice or knowledge are equivalent to knowledge. So, when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation ... the statute commences to run") (citations and quotation omitted); *see also Hamilton Materials, Inc. v. Dow Chemical Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007) (A "plaintiff is on inquiry notice of its fraud claims when he 'learns, or at least is put on notice, that a representation [is]

1  false.'") (adding brackets and quoting *Brandon G. v. Gray,* 111 Cal. App. 4th 29, 35 (2003);

2  *Norgart v. The Upjohn Co.*, 21 Cal. 4th 383, 397 (1999) ("plaintiff discovers the cause of action

3  when he at least suspects a factual basis, as opposed to a legal theory, for its elements," *i.e.*

4  wrongdoing, causation and harm) (citing *Jolly*, 44 Cal. 3d at 1110).

5        In brief, "'under the delayed discovery rule, a cause of action accrues and the statute of

6  limitations begins to run when the plaintiff *has reason to suspect an injury and some wrongful*

7  *cause*, unless the plaintiff ... proves that a reasonable investigation at that time would not have

8  revealed a factual basis for *that particular cause of action*.'" *E-Fab, Inc.*, 153 Cal. App. 4th

9  (quoting *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803 (2005) (emphasis added in *E-*

10  *Fab*).

11        It is undisputed that Plaintiffs filed this action on December 31, 2002. Thus, in order to

12  fall within the statute of limitations, Plaintiffs must have discovered the facts constituting the

13  alleged fraud on or after December 31, 1999. Wood argues that by July 1, 1997, Plaintiffs were

14  on notice that they had been the victims of fraud. Wood notes that Marshall was a transactional

15  attorney and, thus, was not an unsophisticated investor. Wood also relies heavily on the July 1,

16  1997 Letter, in which Marshall wrote to Mainas:

17      [a]s you know, I have been tremendously disappointed in you and this cable project in Bulgaria. Each time we talk there is a different story about
18      why you and GSTS have not done what you have promised to do. And, generally speaking, *it becomes apparent that the whole project was an*
19      *effort to get money from me with little or no intention to follow through on the project*. ... So that there is absolutely no further misunderstanding can
20      be alleged by you [*sic*], I thought that it would be useful to summarize where we are with my investment in the Bulgarian cable project and then to
21      ask you the simple question: what, if anything, are you/GSTS going to do to correct the mess that you have created.

22

23  (July 1, 1997 Letter (emphasis added).)

24        Marshall then proceeded to set forth a series of bullet points, outlining the actions

25  Mainas failed to take and statements that Marshall believed to be untrue. For example, in

26  connection with the second $250,000 investment, he stated that:

27      [y]ou further convinced me to pay this additional $250,000 by arguing that you wanted to invest in the project by buying an interest in my company....
28      (When offered, Bob Wood expressed an interest but explained that it was unlikely that he would have the money as he had had more than $100,000

7

> stolen by John Novak – although now, it turns out, it has been revealed by <u>your own admission to Bob and I</u> that it was taken by you and for your own benefit. This fact indicated to me that my investment in GSTS's project in Bulgaria was, in all likelihood, a complicated fraud against me[.])

(*Id.*, underscore in original, italics added.)

Marshall concluded:

> ... You know that I am not rich and cannot afford to have this money taken from me by misrepresentation or fraud. If it were my own stupidity or a bad investment choice, then that is my fault. This was not. You have not explained any of the lies, misrepresentations and deceptions except to say that you won't put the answers in writing. Your swears and insults are not a substitute for making me whole.
>
> I have paid $500,000 and it seems that I have been cheated out of the entire sum. What do you intend to do about it? Please do not tell me any further stories about how potential investors are desperate to invest in GSTS and that you will pay me back my entire investment immediately.

(*Id.*.) During his deposition, Marshall acknowledged the letter accused Mainas of "defrauding" him. (Stiglich Supp. Decl., Ex. A, Marshall Depo. at 215:18-24.)

Plaintiffs do not dispute that Marshall wrote the July 1, 1997 Letter, but they argue that it does not conclusively establish that their claims are time-barred. Plaintiffs point to evidence that Wood edited the letter and argue that, by doing so, Wood was covering up his own involvement. Yet the fact that Plaintiffs may not, at this time, have known of Wood's involvement in the alleged fraud is immaterial, "because the identity of the defendant is not an element of any cause of action." *Norgart*, 21 Cal. 4th at 399.

However, Plaintiffs also present evidence that, after Marhsall wrote the letter, he traveled to Bulgaria to try and press the Cable Venture forward. (Wintner Opp. Dec., Ex. A, Marshall Depo. at 217:5-8.) Plaintiffs also rely on evidence that Wood continued to reassure Marshall that the Cable Venture would proceed and that he just needed to be patient. (*See, e.g.,* Winter Opp. Decl., Ex. A, Wood Depo. 217:17-22, 219:20-24.) According to Plaintiffs, it was reasonable for Marshall to rely on Wood's reassurances, because of their close friendship. Plaintiffs also suggest that Wood's statements were consistent both with GCS' financial statements, which suggested the Cable Venture remained a viable project, and a Deloitte analysis that "concessions" secured by the licenses would last 35 years or more. (*See* Stiglich

8

1  Supp. Decl., Exs. H, M.)  Wood argues that Marshall admitted that he did not review the
2  financial statements in question, thereby undermining Plaintiffs ability to show they were not
3  negligent in failing to discover their claim earlier.  (*See* Stiglich Supp. Decl., Ex. A, Marshall
4  Depo. at 221:1-23.)[4]  Wood also contends that these documents would have alerted Plaintiffs to
5  the fact that there were, in fact, serious problems with the viability of the Cable Venture.

6  Although Wood has submitted substantial and compelling evidence in support of his
7  argument, the Court must view the facts in the light most favorable to Plaintiffs.  As such, the
8  Court finds that Plaintiffs have put forth sufficient evidence to create a genuine issue of
9  disputed fact as to when Plaintiffs were on notice that they had been harmed.  *See Norgart*, 21
10 Cal. 4th at 397 ("plaintiff discovers the cause of action when he at least suspects a factual basis,
11 as opposed to a legal theory, for its elements," *i.e.* wrongdoing, causation and harm) (citing
12 *Jolly*, 44 Cal. 3d at 1110).  Thus, the Court cannot say as a matter of law that the only
13 reasonable inference is that Plaintiffs' fraud claim accrued in July 1997.  That is a matter for the
14 jury to decide, and the Court DENIES Wood's motion on this basis.

**C.   There Are Disputed Issues of Material Fact that Preclude Summary Judgment on the Fraud Claim.**

17 Wood also moves for summary judgment on the basis that Plaintiffs cannot establish
18 four of the five essential elements of their fraud claim.  In his opening brief, Wood parses the
19 eight misrepresentations and omissions identified in FAC paragraph 117 into four categories:
20 (1) the future profit statements (FAC ¶¶ 117.d, 117.f, 117.g); (2) the joint venture statements
21 (FAC ¶¶ 117.a, 117.b, 117.c); (3) the referral and partnership statement (FAC ¶ 117.e); and (4)
22 the service statement (FAC ¶ 117.h).  Wood argues that, as to each of these categories, Plaintiffs
23 cannot establish that: (1) Wood made a misrepresentation; (2) that Wood knew the
24 representation was false; (3) that Wood intended to induce Plaintiffs to rely on the

---

[4] It is not entirely clear from the record that this testimony refers to Exhibit M to the Stiglich Supp. Decl, although the deposition testimony includes a reference to Bates Number "687, and Exhibit M is a document with the Bates Number range of BTG00677-BTG00688.

9

1  misrepresentation; and (4) that Plaintiffs justifiably relied on the misrepresentation. *Hunter v.*
2  *Up-Right, Inc.*, 6 Cal. 4th 1174, 1184 (1993).

3  In their opposition brief, Plaintiffs do not respond to Wood's arguments about each
4  category of statements. Rather, Plaintiffs refer the Court to evidence that they contend Wood
5  failed to disclose to them, when he was soliciting Plaintiffs to invest in the Cable Venture.
6  Plaintiffs argue that these omissions were material to their decision to invest in the Cable
7  Venture.[5] Wood's reply focuses entirely on the manner in which Plaintiffs' frame the fraud
8  claim in their opposition, namely that Wood failed to disclose material information to induce
9  them to invest in the Cable Venture. The Court shall follow the parties' lead, and it also
10 analyzes the fraud claim as framed by Plaintiffs in their opposition brief.

11 Wood first argues that there is no evidence that he induced or convinced Plaintiffs to
12 invest in the Cable Venture. Plaintiffs' claims in this regard are based on the allegations that
13 Deloitte would guarantee the value of the Cable Venture, which Plaintiffs also claim Deloitte
14 valued at $48 million. Wood denies that he made a guarantee to Plaintiffs, and he presents
15 evidence that it would have been unlikely for Deloitte to do so. (Stiglich Supp. Decl., Ex. B,
16 Wood Depo. at 269:1-19; Stiglich Supp. Decl., Ex. C, Ashby Depo. at 87:16-24; *see also*
17 Stiglich Supp. Decl., Ex. D, Mainas Depo. at 206:12-207:4.) Marshall testified that he
18 "expected" that Wood, on behalf of Deloitte, was giving Marshall a guarantee on the value of
19 the Cable Venture. At the same time, Marshall acknowledged that Wood did not suggest that if
20 he was wrong, Deloitte would pay Plaintiffs their share of the investment ($24 million).
21 Marhsall also acknolwedged that Wood never put the guarantee in writing. (*See* Stiglich Supp.
22 Decl., Ex. A, Marshall Depo. at 87:5-89:19.) Although Wood argues that Plaintiffs cannot

---

[5] In his reply, Wood argues that "Marshall does not contest that he cannot sustain his fraud claim as to the joint venture statements, the referral and partnership statement, or the service statement."(Reply at 10 n.12.) It is not clear to the Court that this is, in fact, Plaintiffs' position. The Court suggests that the parties meet and confer in advance of their pretrial filings deadlines in order to clarify what statements and/or omissions are truly at issue in this case.

10

1 prevail on the basis of their "feelings" alone, the Court finds this is a credibility dispute that is
2 properly resolved by a trier of fact.[6]

3 Wood also argues that he provided documents to Marshall, which should have alerted
4 Plaintiffs to the risks involved in the investment. Wood also argues that Plaintiffs were fully
5 aware that the status of the joint venture was uncertain (*See* Mot. at 6:13-9:23, citing Stiglich
6 Supp. Decl., Exs. E, G-M.) Wood argues that these facts show both that he had no intent to
7 defraud Plaintiffs, and that Plaintiffs could not have justifiably relied on any purported
8 misrepresentations about the value of the Cable Venture. Plaintiffs, in turn, argue that Wood
9 possessed a number of documents, which he failed to disclose to them, that would have been
10 material to their decision to invest. (*See* Opp. Br. at 14:16-16:28, citing Wintner Opp. Decl.,
11 Exs. E-L.)

12 Some of these documents appear to have been created *after* Plaintiffs decided to invest
13 and, thus, it is not clear that they would have been material to the decision to invest. (*See, e.g.,*
14 Wintner Opp. Decl., Exs., E, L.) With respect to one of those documents, which states that
15 "[b]efore we can sell a potential investor" on the Cable Venture, "we must first answer the
16 obvious questions regarding the economic and political environment as well as other similar
17 issues." (*Id.*, Ex. L.) Plaintiffs argue that, as investors, they were not provided with those
18 "answers" before they invested. Therefore, although the letter was written after Plaintiffs
19 decided to invest, taking the light in the facts most favorable to Plaintiffs, the Court cannot say
20 a reasonable juror could not view this evidence as probative of Wood's intent.

21 Wood also argues that some of the documents on which Plaintiffs rely include
22 information that Marshall knew at the time Plaintiffs decided to invest, including the fact that
23 there was an issue as to whether GSTS owned the cable licenses. (*Compare* Wintner Opp.

---

[6] Wood relies on *Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1201 (9th Cir. 2001), which addressed a fraud claim based on alleged misrepresentations regarding an auditor's competence to conduct an audit. However, that case is distinguishable, because it does not present the credibility question set forth above. Rather, the court found that the plaintiff's belief that he had the right to reject the auditor if it were incompetent or biased, was insufficient to establish reasonable reliance on a purported misrepresentation, because it was contradicted directly by a document showing that plaintiff had no discretion to reject the auditor. *Id.* at 1201.

11

Decl., Ex. G, *with* July 1, 1997 Letter at 2-3.) However, one of these documents is a letter that criticizes a report Wood did provide to Plaintiffs regarding the Cable Venture (the "Batchelor Report"), which Marshall testifies he relied upon in deciding to invest in the Cable Venture. (*See* Declaration of Lidia Stiglich in Reply ("Stiglich Reply Decl."), Ex. T, Marshall Depo. at 113:1-19.)

Wood does not dispute that he did not provide this letter to Plaintiffs, but he argues that "[s]ince he had access to the same documents, Marshall a sophisticated corporate attorney with extensive due diligence in Eastern European business transactions - can hardly complain that he was not capable of developing the same inquires that were made" by the author of the letter. (Reply at 11:8-16.) Again, however, taking the facts in the light most favorable to Plaintiffs, the Court cannot say a reasonable juror would not find this evidence to be material to Plaintiffs' decision to invest in the Cable Venture.

For these reasons, the Court concludes that Plaintiffs have put forth sufficient evidence to show that there are disputed issues of fact on their fraud claim. Accordingly, the Court DENIES Wood's motion for summary judgment on this basis as well.

## CONCLUSION

For the foregoing reasons, the Court DENIES Wood's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: January 30, 2012

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE